IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ANGELA MONIQUE BARNES                                                            PLAINTIFF

v.                          Civil No. 03-2284

YORKSHIRE TOWNHOMES/
ERC PROPERTIES, INC.                                                              DEFENDANT

## MEMORANDUM OPINION

This is a housing discrimination case. Plaintiff contends she was discriminated against on the basis of her race. The plaintiff proceeds pro se and in forma pauperis.

On November 18, 2005, the defendant filed a summary judgment motion (Doc. 62). By order entered on November 22, 2005, plaintiff was directed to complete, sign, and return an attached questionnaire that would serve as her response to the summary judgment motion (Doc. 65). On December 6, 2005, plaintiff filed a response to the summary judgment motion (Doc. 66), a brief (Doc. 67), a statement of facts (Doc. 68), and a response to the court's questionnaire (Doc. 69). The defendant's summary judgment motion is now before the undersigned for decision.

### BACKGROUND

Yorkshire Townhomes is a subsidiary of ERC Properties, Inc. *Plaintiff's Response* (hereinafter *Resp.*), Doc. 69 at ¶ 1. Yorkshire Townhomes is an apartment complex or community. *Resp.* at ¶ 4.

-1-

Plaintiff, Angela Barnes, resided at Yorkshire Townhomes from December 11, 2002, until January 3, 2004.[1] *Resp.* at ¶ 3. She lived in apartment #34. *Resp.* at ¶ 33. Barnes is black. *Id.* at ¶ 107.

Charise Stickler was the regional director of Yorkshire Townhomes while Barnes was a resident there. *Resp.* at ¶ 2. Yorkshire Townhomes had a resident manager or community director who had the responsibility for day-to-day operations. *Id.* at ¶ 5.

Stickler was made aware of any problems that were out of the ordinary and that might effect the financial integrity of Yorkshire homes. *Resp.* at ¶ 6. This included evicting tenants or non-payment of rent. *Id.*

Stickler knows of no remarks or actions taken against Barnes because of her race. *Id.* at ¶ 18. Stickler knows of no remarks or actions taken against Barnes by tenants based on her race. *Id.* at ¶ 19.

Connie Ritter was the residential manager from July 18, 2002, until June 15, 2004. *Id.* at ¶ 16 & *Deft's Ex.* 4. Ritter lived at the apartment complex. *Resp.* at ¶ 55. Her duties included the following: moving new residents into apartment units; evicting residents; keeping paperwork as needed; noting problems involving residents and others coming into the complex; answering and cooperating with police calls; trying to stop fights; making bank deposits of company funds; and being a negotiator, arbitrator and peacemaker among the tenants. *Id.* at ¶ 56.

According to Ritter, Barnes was a constant complainer mostly about noise she believed was excessive. *Resp.* at ¶ 59 & *Plff's Ex.* D. Barnes would complain about children making too

---

[1] Barnes hand wrote these dates of residency in response to a question from the court. However, in other places she indicates she lived at Yorkshire Townhomes prior to December of 2002. *See e.g., Resp.* at ¶ 43(she indicates she began to complain about Mankin on April 22, 2002); ¶ 57 (she indicates she was already a resident of Yorkshire when Ritter began working there (July 18, 2002)); ¶ 75 (she indicates she began to complain about noise on April 22, 2002).

AO72A
(Rev. 8/82)

much noise in and near the area of her apartment. *Id.* at ¶ 60 & *Plff's Ex.* D & E. Ritter believed the children Barnes made complaints about made no more noise than any other group of children and were fairly well behaved. *Deft's Ex.* 4.

According to Ritter, one time when Barnes complained about small children making excessive noise, there were four children playing with dolls, cars, and toys on the front porch of the Mankin apartment. *Deft's Ex.* 4. Two of the children were Angela Yokum's children and two were Mankins. *Id.* Ritter told the children to move to the other side of the yard and they did. *Id.*

Ritter indicates the Yokum children were black and the Mankin children were white. *Deft's Ex.* 4. Barnes, however, states she is without knowledge to agree or disagree with this statement. *Resp.* at ¶ 64. She states she knew Angela Yokum favored a white woman and Barnes "saw" Yokum's sons as white. *Id. See also Resp.* at ¶ 107 ("children–various race (?)").

At the same time, Ritter states there were four young black men playing football in the general area and making more noise than the younger children. *Deft's Ex.* 4. Ritter indicates Barnes never complained about the noise they were making. *Id.* Barnes asserts that she never "tried to make differences in filing [her] noise complaints." *Resp.* at ¶ 66. If the men were making noise around her home while she was there, Barnes states she would have complained. *Id.*

Angela Yokum's mother lived in the complex. *Resp.* at ¶ 67. One time when Angela Yokum came to visit, Barnes went outside and took pictures of her car and wrote down the license plate numbers off other cars. *Id.* at ¶ 68. Barnes indicates she did this for evidence. *Id.*

Yokum complained to management about this and the police were called. *Resp.* at ¶ 69. Barnes also took pictures of the neighbor's children and visitors. *Id.* at ¶ 70.

On another occasion Ritter contends Barnes was screaming at Yokum's children for making too much noise. *Deft's Ex.* 4. Barnes denies having done this. *Resp.* at ¶ 71.

Ritter indicates she observed that Barnes always had her window raised on the yard side two or three inches. *Deft's Ex.* 4. Ritter states she told Barnes that if she would shut the window, the noise would not bother her so much. *Id.* According to Ritter, Barnes refused. *Id.*

Barnes, on the other hand, states she opened and closed her windows at different times because she doesn't like it took hot or too cold. *Resp.* at ¶ 72. However, she states she wouldn't sit there with the window open when she sought peace. *Id.* at ¶ 73.

Ritter indicates Barnes went into neighbors' apartments without permission, went through their cars, and their personal possessions. *Deft's Ex.* 4. Barnes states she never knew any residents claimed she went into their homes. *Id.*

Ritter maintains she called the police almost every day and told them about Barnes' complaints. *Deft's Ex.* 4. On September 26, 2002, Barnes became very irate over a new curfew policy. *Deft's Ex.* 6.1. Barnes was arrested for disorderly conduct and a visitor to #41, Soniquea Washington, was banned from the property. *Id.* Barnes indicates she doesn't know if Washington was banned but she states she was arrested for disorderly conduct. *Resp.* at ¶ 117.

On February 6, 2003, the police were called to Yorkshire Townhomes because of Barnes' complaint about the children in Mankin's apartment being loud. *Deft's Ex.* 6. Ritter also indicates she had to call the police when Barnes got out of control. *Deft's Ex.* 4.

AO72A
(Rev. 8/82)

On February 23, 2003, the police were called to Yorkshire Townhomes as a result of Barnes' complaining about a disturbance caused by Mankin. *Resp.* at ¶ 110. Mankin's children were playing. *Id.*

According to defendant, on March 21, 2003, Barnes interfered with a security guard. *Deft's Ex.* 6. The guard was trying to talk to Shauna in #20 about pulling a cap over a child's face. *Id.* Barnes came and got Shauna from the guard and walked off with her before the guard could get the matter settled. *Id.* Barnes maintains the security guard was not allowing the woman to talk to the child so she came and asked them to follow her. *Resp.* at ¶ 111.

On March 21, 2003, the police were called because Barnes complained of children making too much noise playing outside. *Deft's Ex.* 6; *Resp.* at ¶ 112. The children were told to calm it down. *Id.*

On March 22, 2003, Barnes used the phone frequently and said that the people at Yorkshire Townhomes didn't do their "damn jobs," the woman beside her needed to be taken care of, and the security guard didn't know the "damn emergency" number. *Deft's Ex.* 6. The security guard asked Barnes to stop cursing and to keep her voice down. *Id.*

Barnes complained that Mankin and her children were making too much noise. *Deft's Ex.* 6; *Resp.* at ¶ 115. Both Barnes and Mankin were given write ups and the two of them had words. *Deft's Ex.* 6; *Resp.* at ¶ 115. Security tried to get the issue between them settled. *Id.*

Although she is not sure of the date, Barnes indicates she did tell the security guard he didn't do his job. *Resp.* at ¶ 113. She also indicates she went to the police in order to get a report made about the unnecessary noise. *Id.*

AO72A
(Rev. 8/82)

On March 23, 2003, Barnes complained to the security guard that Mankin was making all kinds of noise. *Resp.* at ¶ 116. The guard went over and told Mankin to quiet down. *Id.* Barnes thought the guard said it too quietly and wasn't doing his job. *Id.* Barnes wanted to get the guard fired. *Id.*

Ritter indicates that there was one time when Barnes went to the office partially dressed and the employees there were afraid and called the police. *Deft's Ex.* 4. On another occasion, Ritter indicates Barnes got into a serious fight with a black family living at the townhomes and ended up hitting the man, Mr. Robinson. *Id.*

Ritter indicates Barnes on one occasion came to Ritter's apartment at 2:00 a.m. to say her neighbor was stomping up the stairs or pounding on walls. *Deft's Ex.* 4. Barnes states she may have gone over there one night to complain but it was not that late. *Resp.* at ¶ 76.

According to Ritter, one night Barnes went to Ritter's apartment every thirty minutes to complain about noise coming from Mankin's apartment. *Deft's Ex.* 4. Ritter states she walked around to the back of the Mankin apartment but heard no TV, saw no lights, and heard no loud talking. *Id.* Ritter walked around the front and listened and heard nothing. *Id.* Barnes denies this occurred. *Resp.* at ¶ 77- ¶ 80.

Barnes complained about the rules the complex had. *Resp.* at ¶ 81. According to Ritter, Barnes approached prospective tenants and discouraged them from moving there saying it was like a concentration camp. *Deft's Ex.* 4.

Barnes states they were asked to sign an addendum. *Resp.* at ¶ 81. She states she let the tenants know that they had rights to know the full meaning of the addendum before it was signed. *Id.* at ¶ 84.

AO72A
(Rev. 8/82)

Ritter moved one of Barnes' neighbors to a different location to satisfy Barnes. *Resp.* at ¶ 85. Ritter states that a black family was moved out partially in response to Barnes' constant complaints. *Deft's Ex.* 4. Barnes states if this occurred she was not aware of it. *Resp.* at ¶ 93.

Ritter also indicates a Mexican family was moved out of the complex because of Barnes' constant harassment of the family. *Deft's Ex.* 4. Barnes states that if the "family was upset because of [her] personal business" she was not aware of it. *Resp.* at ¶ 95.

At times, when Ritter was dealing with black residents, Ritter maintains Barnes would interfere with Ritter and the police, hollering out that they were discriminating against blacks because of their race. *Deft's Ex.* 4. Barnes states she was outside with the tenants to protest and to speak out for their tenant's rights. *Resp.* at ¶ 95.

Barnes never reported to Ritter that others had discriminated against her because of her race. *Resp.* at ¶ 97. Ritter never saw or heard anyone call Barnes names, or make racial slurs of any kind. *Deft's Ex.* 4. Ritter never saw Yorkshire Townhomes or ERC go as far with any other tenant to satisfy them as they did with Barnes. *Id.*

On November 13, 2003, and December 8, 2003, Ritter served Barnes with eviction notices. *Resp.* at ¶ 100 & ¶ 102. The notices were based on Barnes being behind on her rent. *Id.* at ¶ 101 & ¶ 102. On December 19, 2003, a warrant was issued for Barnes' arrest based on her failure to vacate her apartment at Yorkshire Townhomes. *Deft's Ex.* 5. Barnes was arrested on December 23, 2003. *Resp.* at ¶ 103. After a trial, the failure to vacate offense was dismissed. *Id.* at ¶ 104.

Barnes has sued Ritter at least three times. *Id.* at ¶ 87. One of the suits Barnes filed was in Fort Smith Municipal Court, case number 03-321. *Id.* at ¶ 88; *Deft's Ex.* 7. It alleged denial

of tenant rights and civil rights. *Id.* The case was dismissed for lack of jurisdiction. *Id.* at ¶ 89; *Deft's Ex.* 7.

While Barnes lived at Yorkshire Townhomes, her neighbor was Rosemary Mankin. Mankin and her daughter Rosetta moved to Yorkshire Townhomes in late 2001 and occupied apartment #33. *Resp.* at ¶ 31 & 32. The doors to apartments 33 and 34 face each other. *Id.* at ¶ 34. Mankin is white. *Id.* at ¶ 107.

Barnes filed numerous complaints against Mankin. *Resp.* at ¶ 15. Barnes states she complained frequently about "disturbing noise" that came from Mankin's home. *Resp.* at ¶ 8. Barnes indicates she doesn't know if the noise was caused by Mankin, her child, or visitors to the residence. *Id.*

According to Mankin, in June of 2003, Rosetta liked to play with a younger girl named Precious. *Deft's Ex.* 2. One day, Precious, and her little brother who was 3 or 4 at the time, came to play with Rosetta. *id.* Barnes complained to Mankin that the children were making too much noise. *Id.*

Barnes states she complained more than once about boys and girls making excessive noise in apartment #33. *Resp.* at ¶ 36. However, she states she did not know the names of the children who were guests at the apartment. *Id.* Barnes also complained often that Mankin had too many children in her apartment. *Id.* at ¶ 38.

Any child in Mankin's apartment was either an acquaintance of Mankin's or Rosetta's not a tenant. *Resp.* at ¶ 39. Mankin never saw any white women, or anyone else, harass Barnes. *Deft's Ex.* 2.

AO72A
(Rev. 8/82)

According to Mankin, on one occasion a lady named Angela came to visit her mother at the apartment complex. *Deft's Ex.* 2. Angela brought her children with her. *Id.* Mankin indicates Barnes was upset by this and wrote down the license plate number of Angela's car and other cars. *Id.* Barnes indicates she probably was trying to get evidence. *Resp.* at ¶ 41. Barnes agrees this incident had nothing to do with race. *Id.* at ¶ 42.

Mankin estimates that Barnes complained about her, her children, and excessive noise at least fifty times. *Deft's Ex.* 2. Barnes states she began to complain in 2002 but no record was made of her complaints until February 6, 2003. *Resp.* at ¶ 43. Mankin was still living at Yorkshire Townhomes when Barnes was evicted. *Id.* at ¶ 44.

According to Mankin, there were more blacks than whites living at the complex. *Deft's Ex.* 2. There are also some Hispanics living there. *Id.* Mankin never heard or saw anyone of any race or color use racial slurs, racial names, or treat Barnes any differently because she is black. *Id.* Mankin never heard or saw Ritter treat Barnes any differently because of her race or use racial slurs, or racial names about her. *Id.*

Barnes sued Mankin. *Resp.* at ¶ 49 & *Plff's Ex.* C. The nature of the claim was listed as private nuisance. *Plff's Ex.* C. The lawsuit was dismissed. *Resp.* at ¶ 51.

Barnes asserts she even had to call the police in order to get a verified report made regarding her complaints against apartment #33. *Resp.* at ¶ 15. Barnes states management refused to provide her "verified proof" of the complaints she had made toward the tenants of #33. *Id.*

Barnes concedes a certain amount of noise is part of apartment living. *Id.* at ¶ 9. All of Barnes' complaints were based on noise or other fact-based disturbances and not on race. *Id.*

-9-

at ¶ 20. However, Barnes asserts "the unnecessary noise was bestowed upon [her] by the events that occur[r]ed in the tenants of #33 residence area." *Id.* She also maintains Stickler and other ERC employees by their actions "bestowed racial prejudices against" her by denying her rights as a tenant and by "allowing the tenants of #33 to live as if they had nothing to worry about, while disturbing others' homes." *Id.* at ¶ 26. Barnes maintains ERC's employees were very lenient towards the white tenants in #33 and their company. *Id.* at ¶ 28. *See also Resp.* at ¶ 96; Doc. 67 at p. 1.

Barnes made a formal complaint to HUD on December 27, 2002, about the same incidents that form the basis of her complaint in this case, case number 06-03-0149-8. *Resp.* at ¶ 21; *Deft's Ex.* 8. In her complaint, Barnes alleged she was being discriminated against based on her race because her manager refused to do anything about the resident of #33 who continuously created disturbances. *Resp.* at ¶ 121.

A hearing was held. *Resp.* at ¶ 22. A HUD hearing officer reached a conciliation agreement between Barnes, ERC, and HUD. *Id.* at ¶ 23. Barnes signed the conciliation agreement. *Id.* at ¶ 24.

The agreement called for Barnes to pay rent for the months of April 2003, through September 2003, in the amount of $202.00 per month. *Deft's Ex.* 8. Barnes was to be allowed to pay rent for the months of April and May in installment payments of $25.00 per month. *Id.* The agreement was reached on September 12, 2003. *Resp.* at ¶ 122.

As part of the agreement, Barnes agreed to take no further action against Yorkshire Townhomes and Connie Ritter regarding the allegations, or any of the results of the investigations relating to the allegations, in Title VIII case No. 06-03-0149-8. *Deft's Ex.* 8 at

page 4, ¶ 11. Barnes points out the release was conditioned on Yorkshire Townhomes' full compliance with the conditions set forth in the agreement. *Resp.* at ¶ 123.

Barnes did not pay her rent required by the conciliation agreement. *Deft's Ex.* 1. According to Barnes, she requested information from Yorkshire Townhomes on October 28, 2003, but when she went to pay her rent her request for information was refused. *Resp.* at ¶ 25. Barnes indicates she did not pay her rent because she needed the information. *Id. See also Resp.* at ¶ 124.

Barnes became belligerent and would not pay her rent. *Resp.* at ¶ 29. Ritter, on behalf of Yorkshire Townhomes, evicted Barnes for non-payment of rent. *Id.* at ¶ 30, ¶ 58 & ¶ 127. The eviction occurred on November 13, 2003. *Id.* at ¶ 127.

Ritter offered solutions but her solutions did not satisfy Barnes. *Resp.* at ¶ 16. Barnes asserts Ritter "made a big difference in regards to the treatment of the tenants of #33–discrimination–different." *Id.* at ¶ 17.

According to the defendant, Barnes was a problem tenant. By way of example, defendant indicates Barnes became very violent towards her daughter on one occasion and the police had to be called. *Deft's Ex.* 1. Barnes indicates she spanked her daughter, Radiance Wrye, when she became aware of her daughter committing fornication at the age of fourteen. *Resp.* at ¶ 10 & ¶ 109. Barnes states she called the police herself. *Id.* In support, she offers exhibit A which is a transcript of a state court judgment. The judgment indicates Barnes was arrested and charged with a misdemeanor offense of domestic battery in the third degree on February 6, 2003. *Plff's Ex.* A. *See also Resp.* at ¶ 108. The charge was eventually nolle prossed. *Plff's Ex.* A.

-11-

Defendant also indicates Barnes had seizures, would go into a trance, smile a lot, and walk around rolling her head slowly from side to side. *Deft's Ex.* 1. One time defendant indicates Barnes took her underwear off outside and walked around with one house shoe on and came into the office. *Id.* The employees in the office were scared Barnes might get violent and called the police. *Id.* After the police arrived, Barnes came out of her seizure. *Id.*

Barnes states that when she has seizures she is "unaware of things done." *Resp.* at ¶ 11 & ¶ 12. Barnes, however, states she has never been given a "police report card" to verify these events occurred. *Id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

AO72A
(Rev. 8/82)

"A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## DISCUSSION

Barnes contends the defendant engaged in intentional discrimination on the basis of race in violation of 42 U.S.C. § 1981 and the Fair Housing Act (FHA), 42 U.S.C. § 3604(b). Defendant first contends it is entitled to summary judgment in its favor because plaintiff can produce no evidence from which discriminatory intent can be inferred. Second, defendant contends it is entitled to summary judgment by virtue of the terms of the conciliation agreement which includes an agreement by plaintiff not to sue the defendant and a general release of claims.

### *The Prima Facie Case*

The FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Section 1981 in pertinent part provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . . For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification and termination of contracts, and enjoyment of all benefits or privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(a) & (b).

To prevail under either § 1981 or the FHA a plaintiff must prove discriminatory intent. *See e.g., Dirden v. Department of Housing and Urban Development*, 86 F.3d 112, 114 (8th Cir. 1996). A race discrimination claim brought under either statute is analyzed under the burden-

AO72A
(Rev. 8/82)

shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See e.g., Maxfield Cintas Corp. No. 2*, 427 F.3d 544, 550 (8th Cir. 2005)(applying *McDonnell Douglas* framework to a § 1981 race discrimination claim); *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)(applying *McDonnell Douglas* framework to a housing discrimination claim under the FHA); *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000)(applying *McDonnell Douglas* to housing discrimination claims brought under both § 1981 and the FHA). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case. *Maxfield*, 427 F.3d at 550. Second, if the plaintiff establishes a prima facie case, the defendant must articulate a legitimate nondiscriminatory reason for the action. *Id.* Third, if the defendant does so, the plaintiff must offer evidence showing that the defendant's legitimate reason is merely a pretext for discrimination. *Id.*

Although the prima facie case varies with the type of housing discrimination claim being asserted, in general, the plaintiff, under either statute, must show the following: she is a member of a protected class; she suffered an adverse action; and the circumstances permit an inference of discrimination.

It is undisputed that Barnes is a member of a protected class under § 1981 and the FHA. However, even viewing the facts in the light most favorable to Barnes, there is simply nothing from which malice or discriminatory animus can be inferred. This is not a case where a specific policy has been applied to treat members of the protected class differently than others. *See e.g., Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995)(policy or ordinance at issue-- prima facie case of intentional discrimination made out if the protected individual has been subjected to explicitly differential treatment). Instead, Barnes' housing discrimination claim

-14-

centers on the handling of her complaints while she was a resident at Yorkshire Townhomes. Specifically, Barnes contends her complaints were essentially ignored and Mankin, a white tenant, her children, and her guests, were allowed to create noise and disturb Barnes.

Barnes bases her claim on the following: (1) Mankin was white; (2) Barnes was black; (3) Barnes' noise complaints were not documented by Ritter (Barnes maintains she began making noise complaints in April of 2002 but none were placed in the record until 2003 (Doc. 67 at p. 1)); and (4) Ritter and the security guard at Yorkshire Townhomes, in Barnes' opinion, did not respond to the noise complaints properly causing her to suffer unnecessary noise, *see e.g.,* Doc. 67 at p. 1.

Race discrimination cannot be inferred from the fact that Barnes does not believe her complaints regarding the noise made by Mankin, her children, or her guests were handled properly. Nor does the mere fact that Mankin was white and Barnes was black allow an inference of race discrimination. We note that defendant has submitted affidavits indicating that some of Mankin's guests belonged to the same protected class as Barnes. There is no indication that the noise complaints of other tenants were handled differently than those of Barnes or that the handling of Barnes' complaints was impacted in anyway by her race or the race of Mankin. Barnes has alleged no facts to support her claim that the defendant discriminated against her because she was black. Without more, Barnes cannot establish her claims under § 1981 and the FHA.

*The Release*

As noted above, Barnes filed a complaint of discrimination with HUD. A conciliation agreement was reached and was fully executed on September 16, 2003. *Deft's Ex.* 8. The agreement contains a general release which provides that Barnes:

> hereby waives, releases, and covenants not to sue the Respondent, or to take any further administrative or investigative action against Respondent with respect to any matters which were or might have ben alleged as charges filed with the Secretary as of the date of this Agreement with respect to any matters contained in Title VIII Case Number 06-03-0149-8. This release is conditioned upon the Respondent's full compliance with the conditions set forth in this agreement.
>
> In the event that the Secretary has reason to believe that the Respondent has failed to adhere to the provisions of this Agreement, the matter will be referred to the U.S. Attorney General with the recommendation that a civil action be initiated pursuant to section 3614(b)(2) of the FAIR HOUSING ACT for the purpose of enforcing the terms of the Agreement.
>
> For the purpose of this provision, the Secretary will determine whether or not the Respondent is in compliance with the Agreement.

*Deft's Ex.* 8, Conciliation Agreement at p. 5. Paragraph eleven of the agreement also provides as follows: "The Secretary and the Complainant agree to take no further action against the Respondent with regard to allegations referenced, or any of the results, of the investigations resulting thereto, in Title VIII Case No. 06-03-0149-8." *Deft's Ex.* 8, Conciliation Agreement at p. 4.

The Eighth Circuit has stated that the "most important general concern bearing on the enforceability" of releases is "whether the releases were knowing and voluntary." *Woods v. Rhodes*, 994 F.2d 494, 502 (8th Cir. 1993). Other factors to be considered include the following: the signer's education and experience; her input into the settlement terms; the clarity of the release language; the amount of time the signer had to consider the release before signing it;

whether the signer knew her rights and the relevant facts; whether she consulted with an attorney; whether there was adequate consideration; and whether the signer was induced to sign by improper conduct. *Id.* "[P]arties to a voluntary settlement agreement cannot avoid the agreement simply because the agreement ultimately proves to be disadvantageous." *Worthy v. McKesson Corp.*, 756 F.2d 1370, 1373 (8th cir. 1985).

Clearly, this lawsuit involves the same discriminatory acts alleged in the complaint Barnes filed with HUD. *Resp.* at ¶ 21 & ¶ 121. A hearing was held and Barnes was allowed to speak her mind about the incidents. *Id.* at ¶ 22. The conciliation agreement was reached between Barnes, ERC, and HUD. *Id.* at ¶ 23. Barnes signed the agreement. *Id.* at ¶ 24. The language of the agreement is clear and unambiguous. We believe the release was entered into voluntarily and knowingly and that it bars Barnes from bringing the present lawsuit.

Although Barnes now alleges, in response to the summary judgment motion, that defendant breached the terms of the conciliation agreement, Barnes asserted no such cause of action in her complaint. Moreover, the release states that the "Secretary will determine whether or not the Respondent is in compliance with the Agreement."

To the extent plaintiff's complaint can be read to be asserting state law claims, we decline to retain jurisdiction over those claims. Pursuant to 28 U.S.C. § 1367(c)(3) a federal court may decline to exercise supplemental jurisdiction over state law claims when it has dismissed all claims over which it has original jurisdiction. Having determined defendant is entitled to summary judgment on all federal claims, we conclude judicial economy and the principles of federalism weigh in favor of this court declining to exercise jurisdiction.

## CONCLUSION

For the reasons stated, the defendant's motion for summary judgment will be granted. A separate order in accordance with this opinion will be entered.

DATED this 12th day of December 2005.

>	/s/ Beverly Stites Jones
>	UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)